GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By: JESSICA JEAN HU
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2726
Email: Jessica.Hu@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

CITY OF NEW YORK,

                Defendant.

**19 Civ. 1588 (____)**

The United States of America (the "United States" or the "Government"), by its attorney Geoffrey S. Berman, United States Attorney for the Southern District of New York, alleges as follows:

## PRELIMINARY STATEMENT

1.      The Government brings this Complaint seeking damages and civil penalties against the City of New York ("Defendant" or the "City") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and, in the alternative, under the common law for unjust enrichment and payment under mistake of fact.

2.      On or about May 14, 2014, the City knowingly submitted false certifications to the Federal Emergency Management Agency ("FEMA") in support of the City's indemnification

claim for funds to replace New York City Department of Transportation ("NYCDOT") vehicles that had allegedly been damaged beyond repair as a direct result of Superstorm Sandy ("Sandy").

3.      The City submitted a document to FEMA, known as Project Worksheet 3817/NYC5113 (the "PW"), that contained a description of the alleged damage to NYCDOT vehicles and the amount the City sought in reimbursement. In the PW, however, the City falsely certified that Sandy had directly caused all of the damage and replacement costs. In fact, many of the vehicles identified in the PW were damaged and/or inoperable long before Sandy, and thus ineligible for indemnification.

4.      The City's false certifications were material to FEMA's decision to reimburse NYCDOT for the costs and expenses claimed in the PW, and caused FEMA, on or about July 15, 2014, to approve the PW and approve the payment of millions of dollars to which the City was not entitled.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the Government's FCA claims pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the Government's common law claims pursuant to 28 U.S.C. § 1345.

6.      This Court may exercise personal jurisdiction over Defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), as well as 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims occurred in this District and the Defendant is located within this District.

## PARTIES

7.      Plaintiff is the United States of America.

8.      Defendant is the City of New York, a municipality organized and existing under and by virtue of the laws of the State of New York. NYCDOT is an agency of the City.

## FACTUAL ALLEGATIONS

### I.      FEMA's Public Assistance Program

9.      FEMA's core mission is to support citizens and first responders in building the nation's capability to prepare for, respond to, and recover from all hazards.

10.     Pursuant to the authority granted to it by the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. §§ 5121, *et seq.*, FEMA can provide disaster response assistance and administer disaster response activities. These activities include making "contributions to a State or local government for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster and for associated expenses incurred by the government." 42 U.S.C. § 5172(a)(1)(A).

11.     Within its authority to provide assistance to states and local governments, FEMA administers a Public Assistance ("PA") program, which provides grants to state, tribal, territorial, and local governments to help respond quickly to and recover from major disasters or emergencies.

### A.      FEMA's Required Certifications

12.     States and local governments that have been affected by declared disasters may apply, as either grantees or sub-grantees, for indemnification grants from FEMA's PA program.

13.     As a condition of receiving monies from PA grant programs, all grantees and sub-grantees must submit program certifications that they are complying with applicable federal law

3

and regulations, as well as FEMA's policies and procedures. Grantees and sub-grantees must also certify, as part of their program certification, that the claimed work and costs that they submit to FEMA are both true and correct, as well as eligible for reimbursement.

14.     In addition to the program certifications, which a grantee or sub-grantee makes in advance of submitting a funding request, grantees and sub-grantees are also required to submit individual certifications that attest to the accuracy of a specific claim for reimbursement.

15.     As with program certifications, FEMA relies on these individual certifications to ensure the accuracy and authenticity of the representations made by a grantee or sub-grantee within a specific reimbursement claim.

**B.     FEMA's Relevant Eligibility Requirements**

16.     Generally speaking, in order to be considered eligible for FEMA indemnification, claimed costs must relate to the declared disaster. This requirement applies to equipment, such as vehicles, that are the subject of an indemnification claim. *See* 44 C.F.R. § 206.226.

17.     FEMA's eligibility guidelines accordingly prohibit grantees and sub-grantees from utilizing FEMA's disaster funding to recover costs that are unrelated to the declared disaster.

18.     As an illustrative example, to the extent a vehicle was involved in an accident a week before a declared disaster, absent special circumstances, the replacement costs associated with the earlier accident would be ineligible for FEMA funding.

19.     FEMA's Disaster Assistance Policies ("DAP") further emphasize this tenet of eligibility and state that: "[e]ligible costs are limited to the costs of replacing the destroyed equipment, vehicles, and supplies with the same number of items of *approximately the same age, condition, and capacity*." FEMA DAP 9524.10 (emphasis added).

4

20.     By requiring that funding is available only for costs attributable to the disaster itself, FEMA fulfills its statutory mandate of assisting individuals and communities who have been impacted by disaster.

## II.    Impact of Sandy on New York City

21.     Beginning the week of October 28, 2012, much of the east coast of the United States endured gale-force winds, flooding, heavy rain, and snow, as a result of Sandy, the deadliest and most destructive hurricane of the 2012 Atlantic hurricane season.

22.     On October 26, 2012, the Governor of the State of New York, Andrew Cuomo, declared a statewide state of emergency and asked for a pre-disaster declaration, which President Barack Obama signed later that day.

23.     On October 28, 2012, authorities from the State of New York and New York City activated a coastal emergency plan, with subway closings and the evacuation of residents. More than 76 evacuation shelters were opened around New York City, and Mayor Michael Bloomberg called for a mandatory evacuation of areas near coastlines or waterways. In addition, 200 National Guard troopers were deployed throughout the City.

24.     Storm surge from Sandy hit New York City on October 29, 2012. The surge flooded streets, tunnels, and subway lines, as well as cut power throughout the City.

25.     In New York City, Sandy was ultimately responsible for 43 deaths, the evacuation of 6,500 patients from hospitals and nursing homes, 2 million people being without power, and approximately $19 billion in property damage.

5

**III.     NYCDOT's Post-Storm Response to Vehicle Damage**

     **A.     NYCDOT Fleet Services**

26.     NYCDOT is the City agency charged with maintaining and enhancing the transportation infrastructure of New York City.

27.     NYCDOT employs over 4,500 employees and has an annual operating budget of $900 million.

28.     NYCDOT is broken into operational divisions, including: Bridges; Finance, Contracting, and Program Management; Human Resources and Facilities Management; IT & Telecom; Roadway Repair and Maintenance ("RRM"); Sidewalks and Inspection Management; Staten Island Ferry; Traffic Operations; and Transportation Planning & Management.

29.     Fleet Services is the NYCDOT operational unit responsible for maintaining the agency's fleet of heavy-duty equipment, commercial vehicles, and passenger vehicles.

30.     In order to achieve its core mission, Fleet Services employs approximately 200 individuals in a range of trades, such as: machinists, auto mechanics, electricians, blacksmiths, and engineers.

31.     In the time-period following Sandy, Fleet Services was a subdivision within RRM.

     **B.     Fleet Services' Immediate Vehicle Assessment**

32.     As Sandy's floodwaters receded in the days immediately following the storm, employees at NYCDOT began to take stock of the damage, including damage to the agency's fleet of vehicles.

33.     Within Fleet Services, designated employees began coordination efforts to collect information from auto shops and auto yards across the City's five boroughs.

6

34.     Fleet Services' immediate goal was simply to reach an informed understanding as to the functional status of NYCDOT's fleet.

35.     NYCDOT needed this information to assess its ability to perform core operations, such as towing, street cleaning, snow removal, paving, as well as NYCDOT's vehicle capacity to participate in the ongoing recovery efforts following Sandy.

36.     In the days immediately following Sandy, however, Fleet Services employees involved in the day-to-day efforts to catalog storm damage did not receive any instruction that their efforts would also be used as the basis for an indemnification request to FEMA.

37.     Not a single Fleet Services employee, from the Executive Director of Fleet Services ("ED of Fleet") on downwards, ever received any training or information about FEMA's eligibility requirements.

38.     Although many of the employees involved in the project had the requisite knowledge and expertise to assess whether damage to a vehicle pre-dated the storm, no one within Fleet Services took any steps to make such an assessment.

39.     Fleet Services made no effort to either inspect the damaged vehicles or review their documentation to determine what, if any, of the reported damage was actually related to the storm.

40.     As they aggregated their list of vehicles purportedly damaged by Sandy, Fleet Services employees considered only whether a vehicle had sustained *any* damage during the storm, without regard to the condition of the vehicle prior to Sandy.

41.     As a result of this process, many of the vehicles that Fleet Services included on its "final" list of Sandy-damaged vehicles had been non-operational—and some had even been marked for salvage—years before Sandy.

**IV.     NYCDOT's Request for FEMA Funding**

      **A.     NYCDOT Program Certification**

42.     To participate in the PA program, the City was required to submit to FEMA an executed State Office of Emergency Management Applicant Certification" (the "Program Certification").

43.     The Program Certification stated that it was "to certify the receipt of the guidelines, and associated documents for the Presidential Declaration as administered by the State Office of Emergency Management (SOEM)." The document further stated that "[i]t is understood that by choosing to participate in the grant program, the subgrantee is responsible to: 1) comply with all federal and state laws, regulations, policies, and procedures; 2) fulfill the eligibility requirements to participate as a subgrantee of the State; and 3) certify that all figures to be provided in the application are true and correct for costs associated with the declaration provisions."

44.     The Program Certification additionally included a blank line on which the certifier indicated the entity for which the certification was made, and on this line, a representative of NYCDOT wrote in by hand "New York City Department of Transportation."

45.     The Program Certification further stated that "[t]he signature below indicates the intent," of the named sub-grantee, "to participate in the Presidential Declaration FEMA-4085-DR or EM-NY."

46.     On or about December 19, 2012, a NYCDOT official executed the Program Certification. There was an additional certification above the signature stating that "[t]he undersigned agrees to participate in this program and certifies that to the best of their knowledge

8

and belief, all work and costs claimed are eligible in accordance with the grant conditions and all work claimed has been or will be completed."

47.     After submitting the executed Program Certification to FEMA on or about December 19, 2012, NYCDOT could apply for indemnification from the FEMA PA program as a sub-grantee, with approved funds being distributed through the State of New York (the "State"), as the grantee.

48.     As explained below, NYCDOT did not comply with its statements in the Program Certification.

**B.     The Indemnification Request Certifications**

49.     On or about May 14, 2014, NYCDOT submitted, through the State, a request for FEMA funding to indemnify the City for the cost to replace vehicles that NYCDOT asserted had been damaged beyond repair as a direct result of the storm.

50.     NYCDOT submitted its request to FEMA in the form of a project worksheet that contained a description of the alleged damage and the amount NYCDOT sought to be reimbursed. This project worksheet was assigned the identifier Project Worksheet 3817/NYC5113 (the "PW").

51.     The PW listed 132 vehicles that NYCDOT asserted had been damaged beyond repair as a direct result of Sandy. These 132 vehicles included passenger vehicles, as well as heavy equipment and commercial vehicles. The PW sought a total of $12,758,664 from FEMA, representing the total cost to replace each of the 132 listed vehicles.

52.     NYCDOT attached as an exhibit to the PW a spreadsheet listing 132 vehicles purportedly damaged as a direct result of Sandy. This list of vehicles was the same list described above that Fleet Services had compiled after Sandy.

53.     The PW was accompanied by a series of certifications by NYCDOT officials.

54.     The first certification in the PW was a response to the following question: "Does this PW contain ineligible or Disputed Items." In response to this question, a NYCDOT Deputy Commissioner circled the response "NO," and executed the certification.

55.     A second certification attested that: "[a]ll vehicles and equipment identified in the attached vehicle and equipment damage list were damaged as a direct result of Superstorm Sandy to a state beyond repair." The certification further stated that "I . . . hereby certify that the representation of the vehicle and equipment damaged and associated quantities, presented to FEMA as of 02-01-14 accurately represents the losses incurred as a result of Superstorm Sandy based on my personal knowledge, my review of pertinent records, and discussion with NYCDOT staff with particular knowledge." This certification was signed by another NYCDOT Deputy Commissioner on or about February 11, 2014.

56.     These certifications were false because, as discussed below, many of the damage and replacement costs listed in the PW were not a direct result of Sandy and were thus ineligible for FEMA indemnification.

57.     The NYCDOT officials who executed these certifications knew they were false as to these ineligible costs, or made the certifications with reckless disregard or willful blindness as to their truth or falsity.

58.     NYCDOT knew that the certifications were material to FEMA; that the City was required to verify that all costs for which it sought FEMA indemnification were incurred as a direct result of Sandy, and that in order for the City to receive indemnification for a vehicle at full replacement value, the City was required to verify that the specific vehicle was in good condition and working prior to the storm.

10

V.       **Inclusion of Ineligible Vehicles in the PW**

59.     Although the City certified to FEMA that *all* of the damage and replacement costs included in the PW were eligible for FEMA indemnification, in fact, the PW sought to replace, at the full cost of a brand new vehicle, some vehicles that were non-operational or not in use prior to Sandy.

60.     For example, the 132 listed vehicles in the PW included seven paving vehicles that were ineligible for indemnification. NYCDOT's own internal record system, MCMS, indicated that years before Sandy, the City had already determined that these vehicles were non-operational and designated them for salvage. Nevertheless, NYCDOT sought $3,196,376 for costs associated with replacing these seven pavers.

61.     As another illustrative example, the PW included items such as a trailer trash pump and trailer. Although the NYCDOT documentation reflects that both the trailer and the pump were no longer in service after July 2010, more than two years before Sandy, the PW still sought costs to replace both the trailer and the pump as brand new.

62.     In addition to these examples, the PW included numerous other indemnification claims for vehicles whose records indicated that they had not been in use for significant periods of time prior to Sandy.

63.     Because NYCDOT never reviewed the MCMS history or conducted an in-person inspection of any of the vehicles listed on the PW, replacement costs for numerous ineligible vehicles were included in the indemnification request.

64.     In June 2014, less than one month after the City submitted the PW to FEMA, a NYCDOT employee sent an e-mail to one of the Deputy Commissioners advising that the City had improperly sought reimbursement from FEMA for a number of ineligible vehicles. In

particular, the employee advised that five Dynapac paving machines, which had been submitted as part of the "Sandy relief fund" and were being replaced on this basis, had been non-operational as early as 2009.

65.     The employee further stated that NYCDOT had reported to NYPD in 2009 that "[t]he machines were sitting under the highway in the dump for seven years and were being pick[ed] apart by vandals stealing brass fittings, copper wire harnesses and anything else they could sell for scrap."

66.     In response to this information, NYCDOT took no action in 2014 to correct the PW or inform FEMA that the PW sought indemnification for ineligible vehicles.

67.     Instead, NYCDOT did not revisit the PW until after learning that the United States Attorney's Office for the Southern District of New York was investigating whether the City violated the FCA in connection with the PW.

68.     As a result NYCDOT's false certifications, FEMA paid NYCDOT millions of dollars to replace vehicles that were ineligible for indemnification because they were not damaged by Sandy. FEMA would not have agreed to pay NYCDOT any of these funds had it known that the certifications were false and that many of the vehicles listed in the PW were ineligible for indemnification.

## FIRST CLAIM

### Violations of the False Claims Act: Presenting False Claims for Payment
### (31 U.S.C. § 3729(a)(1)(A))

69.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

70.     The United States seeks relief against Defendant under 31 U.S.C. § 3729(a)(1)(A).

71.     Through the acts set forth above, Defendant knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims to FEMA, an agent of the United States, by falsely certifying that all of the vehicles listed in the PW and its subsequent amendments, were damaged to a state beyond repair as a direct result of Sandy, when in fact, certain of those vehicles and costs were ineligible for reimbursement.

72.     FEMA was not aware of the falsity of Defendant's certifications, and would not have approved the PW or its subsequent amendments at that time if it had known that NYCDOT's certifications were false and that certain of the vehicles in the PW were ineligible for reimbursement.

73.     By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND CLAIM

### Violations of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B))

74.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

75.     The United States seeks relief against Defendant under 31 U.S.C. § 3729(a)(1)(B).

76.     Through the acts set forth above, Defendant knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false statements material to false or fraudulent claims by falsely certifying to FEMA that all of the vehicles listed in the PW and its subsequent amendments, were damaged to a state beyond repair

13

as a direct result of Sandy, when in fact, a number of those vehicles and costs were ineligible for reimbursement.

77.     FEMA was not aware of the falsity of those statements, and would not have approved the PW or its subsequent amendments at that time if it had known that NYCDOT's certifications were false and that certain of the vehicles in the PW were ineligible for reimbursement.

78.     By reason of these false statements, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## THIRD CLAIM

**Violations of the False Claims Act: Failure to Repay Government Funds
(31 U.S.C. § 3729(a)(1)(G))**

79.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

80.     The United States seeks relief against Defendant under 31 U.S.C. § 3729(a)(1)(G).

81.     Through the acts set forth above, Defendant violated the rules and regulations of the FEMA program and knowingly requested and received federal reimbursement for ineligible vehicles and costs. Defendant knowingly failed to return to FEMA the funds NYCDOT improperly received for ineligible vehicles and costs, despite its obligation to do so under applicable FEMA rules and regulations.

82.     By reason of Defendant's failure to repay these funds, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

14

## FOURTH CLAIM

### Payment by Mistake of Fact

83.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

84.     The Government seeks relief against Defendant to recover monies paid under mistake of fact.

85.     FEMA, an agent of the United States, allocated funds to NYCDOT pursuant to the FEMA PA program based on the mistaken and erroneous belief that NYCDOT had sought reimbursement only for eligible vehicles and costs. This erroneous belief was material to FEMA's decision to allocate funds to NYCDOT

86.     By reason of the foregoing, the Government has sustained damages in a substantial amount to be determined at trial.

## FIFTH CLAIM

### Unjust Enrichment

87.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth herein.

88.     The Government seeks relief to the FEMA PA Program to which the City was not entitled and therefore was unjustly enriched.

89.     Through the acts set forth above, Defendant has received payments pursuant to the FEMA PA program to which it was not entitled and therefore was unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Defendant should not retain those payments, the amount of which is to be determined at trial.

WHEREFORE, the United States respectfully requests judgment to be entered in its favor against Defendant as follows:

a. On the First, Second, and Third Claims (FCA violations), for a sum equal to treble damages and civil penalties to the maximum amount allowed by law;

b. On the Fourth Claim (Payment by Mistake of Fact), a sum equal to the damages to be determined at trial, along with costs and interest;

c. On the Fifth Claim (Unjust Enrichment), a sum equal to the damages to be determined at trial, along with costs and interest;

d. Granting the United States such further relief as the Court may deem proper.

Dated: February 20, 2019
  New York, New York

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: */s/ Jessica Jean Hu*
JESSICA JEAN HU
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2726
Email: Jessica.Hu@usdoj.gov
*Attorney for the United States of America*

16